796 A.2d 247

CELL SOUTH OF NEW JERSEY, INC., D/B/A COMCAST COMMU-NICATIONS, INC., PLAINTIFF–APPELLANT, v. ZONING BOARD OF ADJUSTMENT OF WEST WINDSOR TOWNSHIP, DEFENDANT–RESPONDENT.

Argued November 27, 2001—Decided May 14, 2002.

Gregory J. Czura argued the cause for appellant (*Czura Stilwell*, attorneys).

*Trishka Waterbury* argued the cause for respondent (*Mason, Griffin & Pierson*, attorneys).

The opinion of the Court was delivered by

ZAZZALI, J.

This appeal implicates both the increasing public need for wireless communication and the authority of municipalities to regulate the placement of wireless communication towers.

The defendant Zoning Board of Adjustment of the Township of West Windsor (Board or Zoning Board) denied the application of plaintiff Cell South of New Jersey, Inc. d/b/a Comcast Communications, Inc. (Comcast) for a conditional use variance to replace an existing 83–foot wireless communication tower with a 152–foot tower. The trial court concluded that the Board's denial of Comcast's use variance was arbitrary, capricious and unreasonable and granted Comcast the variance. The Appellate Division reversed, holding that Comcast was not entitled to the variance. Because the Zoning Board acted unreasonably in denying Comcast a conditional use variance, we reverse the Appellate Division and reinstate the judgment of the Law Division.

I

In 1995, the Board approved Comcast's application to construct an 83–foot wireless communication tower (monopole or tower) on a

3.25–acre tract of land located on Alexander Road in West Windsor (property or Alexander Road property). The property is located in the ROM–2 zone, an industrial area zoned for research offices and light manufacturing uses. Communication towers are permitted in the ROM–2 zone as a conditional use provided that the towers are no taller than 55–feet. On one side the property is adjacent to Amtrak/New Jersey Transit rail lines. The only other structures on the property are an auto repair garage and a storage facility maintained by Comcast. The closest residential dwelling is approximately 370 feet away.

In 1997, two years after the Board's approval and Comcast's construction of the 83–foot monopole, Comcast submitted another application to the Board to replace the existing monopole with a 152–foot monopole. Comcast sought the variance to improve and expand coverage throughout the West Windsor area, and to permit Sprint Spectrum LP (Sprint), another wireless communications provider, to install its wireless communication antenna on the Comcast monopole.

Comcast presented the testimony of six experts at a hearing before the Board. Joseph Attanasio, a radio frequency expert and Comcast employee, testified that the existing 83–foot tower did not provide adequate service because the monopole did not clear the surrounding tree line, thus necessitating a taller tower. Attanasio noted that because cellular service is "line-of-sight" technology, the existing monopole could not provide adequate coverage or capacity to West Windsor, including an area along the Route 1 corridor. According to Attanasio, a taller tower would not only improve the quality of wireless service, but would expand the tower's capacity, reducing the number of "dropped" or blocked calls along the Route 1 corridor. In Attanasio's opinion, the current demand for cellular service along sections of Route 1 is not satisfied by Comcast's existing monopole.

Two professional planners also testified on behalf of Comcast. Carl Lindbloom stated that replacing the current tower with a taller one would not affect surrounding areas in a negative way

explaining that the new monopole, when viewed from certain vantage points, would be filtered or blocked by existing structures. In addition, he testified that the taller tower would not have a more pronounced environmental impact on the area than the existing monopole. Specifically, Lindbloom observed that the taller monopole, as with the existing tower, would not produce any noise, smoke, odors, heat, dust, glare, or traffic. Lindbloom also noted that the taller tower would permit Sprint to collocate, that is, to set its antenna on Comcast's monopole rather than erect its own tower, thus reducing the overall number of monopoles serving the West Windsor area. Further, the proposed tower would improve "9–1–1" emergency services in the area. A second professional planner, Ralph Ford, testified in respect of a "balloon test" he conducted. According to Ford, he floated a balloon ten feet in diameter and three feet in height approximately 150 feet over Comcast's existing tower to evaluate the visual impact of the proposed tower on the surrounding area. The results of that test revealed that the proposed tower would not adversely impact the aesthetics of the surrounding area.

Other witnesses testifying on Comcast's behalf reached similar conclusions. A Comcast real-estate project manager testified concerning the ways in which the proposed monopole could be camouflaged or disguised from view. The professional engineer who drafted the site plan for the proposed monopole testified that the new tower would be virtually identical to Comcast's existing monopole, except that it would be taller. Finally, a real estate appraiser testified that the proposed tower would not alter the property values of surrounding residences or neighborhoods. He stated that because Comcast did not intend to install a different structure on the property, but rather erect only a higher tower, "the proposed use would not have any measurable bearing on the utility or value of the nearest homes."

In addition to Comcast's experts, West Windsor's planning consultant testified that the new tower would not affect area traffic. He stated that the installation of an antenna was an

appropriate land use in the ROM–2 zone. He also opined that the community would benefit from the collocation of Sprint's antenna atop the proposed tower because it would reduce the total number of monopoles within the township.

Several residents testified at the hearing in opposition to Comcast's application. The residents' concerns focused on the negative visual impact of the proposed tower and the potential impact of the taller tower on property values. The residents did not offer any expert testimony concerning any alleged adverse effect on property values or on whether the proposed tower would impair the intent or purpose of the zoning plan or ordinance.

The Board denied Comcast's application, finding that Comcast had failed to satisfy the positive and negative criteria required for a variance. Specifically, the Board stated that

[f]rom the testimony presented, the Board recognized that ... [the higher tower would improve] the quality of service along Route 1[.] The Board was not satisfied that the current system is not functioning in such a fashion so as to meet and satisfy current FCC requirements. The testimony presented indicated that the current 83–foot high tower was servicing the West Windsor community adequately[.] If problems exist with [Comcast's] system, they exist as a result of the antennas in Lawrenceville and Plainsboro Township. Also, the Board believes that [Comcast] could enhance the quality of its service, ... by exploring other alternatives such as lower towers at multiple other sites or attaching antennas to existing buildings and structures along the Route 1 corridor.

Thus, the Board concluded that because

[t]he benefit from having better service provided to some of the Comcast customers did not outweigh the overall aesthetic impact on the area surrounding the tower, this variance relief could not be granted without substantial detriment to the public good and that granting the variance would substantially impair the intent and purpose of the zone plan and, in particular, the zoning ordinance which regulates antennas in the ROM–2 zone. The Board is concerned that the 150 foot height would create significant visual pollution. The Board is not persuaded from the testimony presented by [Comcast] that real estate values for residential properties in the vicinity of the tower would not be adversely impacted[.]

In 1999, the Law Division reversed the Board's denial of Comcast's application on the ground that the denial was arbitrary, capricious and unreasonable. The court observed that Comcast's expert testimony was unrebutted and that there was no evidence to refute Comcast's claims that it had capacity problems in the

West Windsor area. The court further noted that the residents' testimony was insufficient to prove that Comcast had not met its burden in respect of the positive and negative criteria required for a variance. Accordingly, the court ordered that Comcast's application for a variance be granted.

The Appellate Division reversed, concluding that Comcast was unable to demonstrate that the property was particularly suited to a 152–foot monopole or that there were no alternative sites on which to place the proposed tower. The court stated that even if Comcast could demonstrate the suitability of the tower on the Alexander Road property and the unavailability of alternative sites, the Board acted reasonably in denying the variance because granting the application would result in a substantial detriment to the public good. The court further stated that the record supported the Board's finding that the proposed tower would result in a substantial aesthetic detriment and that Comcast had offered insufficient evidence in respect of available methods to reduce the visual impact of the taller tower. The panel added that the Board was under no obligation to accept the testimony of Comcast's experts even though that testimony was unchallenged.

We granted Comcast's petition for certification. 169 *N.J.* 609, 782 *A.*2d 426 (2001).

II

A

It is well-settled that a decision of a zoning board may be set aside only when it is "arbitrary, capricious or unreasonable." *Medici v. BPR Co.*, 107 *N.J.* 1, 15, 526 *A.*2d 109 (1987). A Court will not substitute its judgment for that of a board "even when it is doubtful about the wisdom of the action." *Cellular Tel. Co. v. Zoning Bd. of Adj.*, 90 *F.Supp.*2d 557, 563 (D.N.J.2000). Because a board of adjustment's actions are presumed valid, the party "attacking such action [has] the burden of proving otherwise." *New York SMSA Ltd. P'ship v. Board of Adj.*, 324 *N.J.Super.* 149,

163, 734 A.2d 817 (App.Div.1999) (citing *Kramer v. Board of Adj.*, 45 *N.J.* 268, 296, 212 *A.2d* 153 (1965)). Accordingly, we will not disturb a board's decision unless we find a clear abuse of discretion. *Medical Realty Assocs. v. Board of Adj.*, 228 *N.J.Super.* 226, 233, 549 *A.2d* 469 (App.Div.1988).

B

Pursuant to the Municipal Land Use Law of 1975, *N.J.S.A.* 40:55D-1 to -129 (MLUL), municipalities are authorized to adopt zoning ordinances within the context of their master plans. Local authority to grant variances from zoning ordinances is governed by *N.J.S.A.* 40:55D-70d, which states, in pertinent part:

The board of adjustment shall have the power to ... [i]n particular cases and for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit (1) a use or principal structure in a district redistricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) *deviation from a specification or standard ... pertaining solely to a conditional use* [.]

  . . .

*No variance or other relief may be granted under the terms of this section, including variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.*

[ (Emphasis added).]

An applicant satisfies the requirements of subsection d when both "positive" and "negative" criteria are met. *Medici, supra,* 107 *N.J.* at 4, 526 *A.2d* 109; *New Brunswick Cellular Tel. Co. v. Borough of South Plainfield Bd. of Adj.*, 160 *N.J.* 1, 6, 733 *A.2d* 442 (1999) (hereinafter *South Plainfield* ). In *South Plainfield,* Justice Pollock explained those criteria:

Generally speaking, *to satisfy the positive criteria, an applicant must prove that the use promotes the general welfare* because the proposed site is particularly suitable to the proposed use.... Further, *to satisfy the negative criteria, in addition to proving that the variance can be granted without substantial detriment to the public good, an applicant must demonstrate* through an enhanced quality of proof ... *that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance.*

[*Supra*, 160 *N.J.* at 6, 733 *A.*2d 442 (citations and quotations omitted) (emphasis added).]

The standard for establishing the "positive" criteria is contingent on the type of variance at issue. In *Coventry Square, Inc. v. Westwood Zoning Board of Adjustment*, 138 *N.J.* 285, 298–99, 650 *A.*2d 340 (1994), we noted that in circumstances where the variance is required to allow a nonconforming conditional use (the d(3) variance), the applicant must demonstrate that the site remains suitable for the use notwithstanding any nonconformity. *Ibid.* In that case, the applicants sought a conditional use variance in order to construct an apartment complex in a zone where such structures were permitted as conditional uses. *Id.* at 288, 650 *A.*2d 340. In affirming the zoning board's decision to grant the variance, we held that the standard for satisfying the positive criteria in conditional use variance applications required that an applicant show "proof sufficient to satisfy the board of adjustment that the site proposed for the conditional use, in the context of the applicant's proposed site plan, continues to be an appropriate site for the conditional use notwithstanding the deviations from one or more conditions imposed by the ordinance." *Id.* at 298–99, 650 *A.*2d 340. Thus, a variance will be awarded if "the site will accommodate the problems associated with the use even though the proposal does not comply with the conditions the ordinance established to address those problems." *Ibid.*

In respect of the negative criteria we held that

[t]he board of adjustment must evaluate the impact of the proposed [conditional use] variance upon the adjacent properties and determine whether or not it will cause such damage to the character of the neighborhood as to constitute substantial detriment to the public good ... [and] the board ... must be satisfied that the grant of the conditional use variance for the specific project at the designated site is reconcilable with the municipality's legislative determination that the condition should be imposed on all conditional uses in that zoning district.

[*Id.* at 299, 650 *A.*2d 340 (citation and quotations omitted).]

In *Smart SMR of New York, Inc. v. Fair Lawn Board of Adjustment*, 152 *N.J.* 309, 316, 704 *A.*2d 1271 (1998), the applicant sought to construct a 140–foot monopole in an industrial zone that was adjacent on one side to a residential area. Notably, the site

selected by the applicant already contained an existing 90–foot monopole. *Ibid.* Experts testified on the applicant's behalf that the failure to construct the monopole on the proposed site effectively would prohibit customers from gaining access to the digital network and would hamper the overall network. *Ibid.* In affirming the grant of the variance, we held that the positive criteria were satisfied because the site was particularly suited for the use, and that the negative criteria also were satisfied because the variance could be granted without substantial detriment to the public good. *Id.* at 332, 704 *A.*2d 1271.

We reached a similar result in *South Plainfield, supra*, 160 *N.J.* at 16, 733 *A.*2d 442. In that case, the applicant proposed the construction of a 90–foot monopole in an area zoned for industrial use. We found that the expert testimony established that the "existing capacity to serve the public was inadequate" and thus the proposed tower "would redress that lack of capacity." *Id.* at 14, 733 *A.*2d 442. Further, the location of the proposed site in an industrial zone between a highway and railroad was a "particularly appropriate site." *Id.* at 15, 733 *A.*2d 442.

### III

■ We conclude that the Board impermissibly denied Comcast a variance to construct the 152–foot monopole. The record does not support the Board's denial of Comcast's application. We also reaffirm our decision in *Smart* and decline to find that wireless communication facilities are inherently beneficial uses.

### A

The positive criteria requirement for a use variance is satisfied when that applicant can demonstrate that the "use promotes the general welfare because the proposed site is particularly suitable for the proposed use." *Medici, supra*, 107 *N.J.* at 4, 526 *A.*2d 109. However, where, as here, the applicant seeks a conditional use variance, the focus is on the continued appropriateness of the proposed site (because that use is already permitted) and not

whether the site is "particularly suited *for the proposed use.*" *Ibid.* (Emphasis added).

In that respect, the ROM-2 zone where Comcast sought placement of the proposed monopole permits communications towers as a conditional use provided their height is no greater than fifty-five feet. Thus, under our decision in *Coventry Square, supra,* Comcast had the burden to demonstrate that its site "continues to be an appropriate site for the conditional use notwithstanding the deviations from one or more conditions imposed by the ordinance." 138 *N.J.* at 298, 650 *A.*2d 340. That standard alleviates Comcast's burden in respect of the positive criteria because Comcast need not prove that the site is particularly suited for the proposed use. Nevertheless, the municipality has determined that monopoles are a permitted and thus an appropriate use in the ROM-2 zone.

As discussed, Comcast was granted a variance in 1995 to construct an 83-foot monopole on the Alexander Road property. In hearings before the Board concerning its 1997 application, Comcast presented unrebutted testimony that the current service to the West Windsor area was inadequate, that the proposed tower would improve service to the West Windsor area, and that the proposed tower would permit Sprint to collocate its antenna on the Comcast monopole thus reducing the overall number of cellular towers in the area. The Board made no specific findings regarding the effect of the 152-foot tower on Comcast's existing site. Because Comcast planned to take down the 83-foot tower and replace it with the 152-foot monopole, the net increase would be 69-feet. In *Smart* we determined that a 50-foot increase in the height of a monopole "would not substantially alter the [borough's] skyline." *Supra,* 152 *N.J.* at 333, 704 *A.*2d 1271; see also *Kingwood Volunteer Fire Co. v. Board of Adj.,* 272 *N.J.Super.* 498, 509, 640 *A.*2d 356 (Law Div.1993) (finding that a 120-foot increase between existing tower and proposed tower minimally affected neighboring community). We also have found that the visual impact of a cellular tower is less in an area zoned for industrial uses. See *South Plainfield, supra,* 160 *N.J.* at 15, 733

*A.*2d 442 ("The aesthetic impact of a 90–foot monopole in an industrial zone ... will be minimal.").

Further, Comcast presented expert testimony that the proposed tower would improve existing wireless services. Attanasio testified that because Comcast's existing tower could not provide proper service to the area, many subscribers did not have access to the cellular system. Attanasio also testified that replacing the existing monopole with a taller tower would "relieve this blocking phenomena" and allow for proper operation of the cellular network. Accordingly, Comcast sought the variance to improve its existing service in the West Windsor area. There was evidence to suggest that Comcast's service was hampered by the limitations of the existing monopole. In *Smart*, we permitted the applicant to replace an existing monopole with a taller tower for the purpose of upgrading the applicant's then existing cellular service to a digital telecommunications system. *Smart, supra,* 152 *N.J.* at 316, 704 *A.*2d 1271. So too, in *South Plainfield* we noted that expert testimony regarding the insufficiency of existing cellular capacity could be considered in determining whether the positive criteria were satisfied. *South Plainfield, supra,* 160 *N.J.* at 14, 733 *A.*2d 442. Here, the record developed by Comcast demonstrates that the Alexander Road site continued to be an appropriate site for a cell tower. Other than its height, the new tower would match the existing tower while improving wireless services. Moreover, we are persuaded by the testimony that notwithstanding the difference in height between the proposed structure and that permitted by the ordinance the site continues to be an appropriate site for the monopole. *Coventry Square, supra,* 138 *N.J.* at 298–99, 650 *A.*2d 340 ("[A] conditional-use variance need only justify the municipality's continued permission for a use notwithstanding a deviation from one or more conditions of the ordinance."). We thus find that Comcast has satisfied the positive criteria.

We are also persuaded that Comcast satisfied the negative criteria as well. As noted, an applicant satisfies the negative criteria if it demonstrates "that the use will not substantially

impair the purpose and intent of the zoning ordinance, or constitute a substantial detriment to the public good." *South Plainfield, supra,* 160 *N.J.* at 15, 733 *A.*2d 442. Here, the objectors alleged that the 152–foot tower would create a negative visual impact adversely affecting surrounding property values. The Board was concerned that the tower would "create significant visual pollution." [1] The Appellate Division found that the Board's decision that the tower would have a negative visual impact was reasonable in view of the testimony at the hearings. The panel stated that although Comcast's expert testimony was unrebutted, a board "was not bound to accept or rely upon that expert testimony." Thus, the Board and the Appellate Division relied solely on the testimony of lay witnesses that the proposed tower would negatively affect the property values of those homes at least 370 feet from Comcast's site.

█ Although we agree that a zoning board may reject expert testimony, we established guidelines in *Smart* directing parties to prove the detrimental effects on property values through expert testimony. "Proof of an adverse effect on adjacent properties and on the municipal land use plan . . . generally will require qualified expert testimony. Bare allegations that the construction of a tower or monopole will cause a decline in property values rarely will suffice." *Smart, supra,* 152 *N.J.* at 336, 704 *A.*2d 1271. The record in this appeal is devoid of any expert testimony concerning the detrimental effects of the proposed tower on surrounding property values.

In contrast to the citizen complaints, Comcast's expert witnesses testified persuasively that the increased tower size would not have a substantial detrimental effect on surrounding areas. A real estate appraiser testified that the taller tower would not "have any measurable bearing on the utility or value of the nearest homes." A city planner stated that the proposed tower would not create

---

[1] We note that in 1999 West Windsor passed an ordinance that approved the construction of a 200 foot monopole.

any traffic problems. An engineer testified that the tower would not emit any noise, odor, smoke, discharge, or waste. Comcast conducted balloon tests to evaluate the visual impact. Those tests revealed that the proposed tower would not adversely affect the aesthetic values in the neighborhood.

■ Although the MLUL reposes considerable power in municipal zoning boards to deny or grant variances, that power must be exercised cautiously. Prudence dictates that zoning boards root their findings in substantiated proofs rather than unsupported allegations. By affording undue weight to the residents' unsubstantiated testimony, the Board disregarded the weight of the evidence in the record in determining to deny Comcast its variance. Because we cannot find persuasive evidence in the record to support the Board's decision denying Comcast the variance, the decision must be set aside as arbitrary, capricious and unreasonable.

B

■ Comcast also contends that the Board's denial of the variance essentially deprives West Windsor area subscribers of wireless service in violation of the Telecommunications Act of 1996(TCA).

In examining claims under the TCA, there are two different review standards. As Judge Bassler noted in *Cellular Telephone Co. v. Zoning Board of Adjustment of Harrington Park,* 90 *F.Supp.*2d 557, 562 (D.N.J.2000),

[t]wo standards of review are applicable ... depending on what section of the TCA is involved: (1) the substantial evidence standard with deference to local findings; and (2) the non-deferential standard.

Comcast apparently relies on 47 *U.S.C.A.* § 332(c)(7)(B)(i)(II), which circumscribes local authority where the local regulation "prohibit[s] or [has] the effect of prohibiting the provision of personal wireless *services.*" (Emphasis added). Comcast alleges that because the current tower does not provide adequate service to Comcast subscribers, a significant "gap" in its service exists.

Thus, the Board's denial has the effect of prohibiting Comcast from providing service to its customers in the West Windsor area. That distinction is important because there "is a 'statutory bar against regulatory prohibition [that] is absolute and does not anticipate *any deference* to local findings.'" *Cellular Tel., supra,* 90 *F.Supp.*2d at 562 (quoting *Cellular Tel. Co. v. Zoning Bd. of Adj.,* 197 *F.*3d 64, 71 (3d Cir.1999)) (emphasis added). Thus, Comcast's claim that the Board's decision prohibits wireless service, if true, would mean that the decision is not entitled to any deference by a reviewing court.

However, this appeal squarely implicates the provision of the TCA that provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service *facilities* shall be in writing and supported by substantial evidence contained in a written record." 47 *U.C.S.A.* § 332(c)(7)(B)(iii) (emphasis added). At issue here is the construction of facilities, not the provision of services. The proper standard, therefore, is the substantial evidence standard.

■ We have held that the substantial evidence standard is analogous to the arbitrary, capricious, and unreasonable standard of review traditionally afforded to decisions of zoning boards under the MLUL. *Rowatti v. Gonchar,* 101 *N.J.* 46, 50–51, 500 *A.*2d 381 (1985) (recognizing that arbitrary, capricious and unreasonable standard of review paralleled substantial evidence standard when applied to decision of zoning board). Given the equivalency of review under the MLUL and the TCA, we find that the Board's decision violated section 332(c)(7)(B)(iii) of the TCA because it was not predicated on substantial evidence. Because we find the Board's denial unreasonable under the more deferential standard of review, we do not address Comcast's contention that the Board's decision prohibited or had the effect of prohibiting the availability of personal wireless services in the West Windsor area.

## IV

■ Comcast urges that we revisit our decision in *Smart* and find that mobile communication facilities are inherently beneficial structures. Although such a determination is not necessary for the disposition of this appeal, we nevertheless address the issue.

A use is "inherently beneficial" if it is "so universally considered of community value that municipalities should be favorably disposed toward their inclusion." William M. Cox, *New Jersey Zoning and Land Use Administration* § 7-4.2(a) at 153 (2002). If a proposed use is "inherently beneficial," an applicant automatically satisfies the "positive" criteria and reduces its burden of proof in respect of the "negative" criteria. See *Smart, supra,* 152 *N.J.* at 323-24, 704 *A.*2d 1271 (1998) (citing *Sica v. Board of Adj. of Township of Wall,* 127 *N.J.* 152, 160-61, 603 *A.*2d 30 (1992)). However, if the use is not "inherently beneficial," the applicant must satisfy not only the "positive criteria," but also the negative criteria by " 'an enhanced quality of proof[.]' " *Smart, supra,* 152 *N.J.* at 323, 704 *A.*2d 1271 (quoting *Medici, supra,* 107 *N.J.* at 21, 526 *A.*2d 109).

As discussed, in *Smart* we outlined four factors supporting our conclusion that mobile communication facilities are not inherently beneficial structures: (1) the facilities serve strictly commercial purposes; (2) inherently beneficial uses are generally limited within a municipality; (3) in contrast to many inherently beneficial uses, mobile communication facilities are practically exempt from state regulation; and (4) the size of mobile communication facilities may become a concern for municipalities. *Supra,* 152 *N.J.* at 329-30, 704 *A.*2d 1271. However, we left open the possibility of reconsidering that finding. *Id.* at 329, 704 A.2d 1271.

Wireless communication has proliferated in the four years since our decision in *Smart.* See Cellular Telecommunications & Internet Association, *Industry Issues & Answers* (2002), *at* http://www.wowcom.com/industry/stats/e911/.html (stating that as of April 2002, there are over 134,000,000 wireless subscribers in the United States as compared to approximately 69,000,000 sub-

scribers in 1998). Nevertheless, the concerns set forth in *Smart* remain extant today. The commercial nature of wireless communication, the seemingly unavoidable increase of monopoles within municipalities to meet consumer demand, the limited jurisdiction of state courts over such facilities, and the increasing size of wireless communication facilities continue to give us pause. As this appeal illustrates, wireless communication providers frequently are able to satisfy both the positive and negative criteria under the MLUL. For the present, the best course is our current path, one that maximizes the use of expert testimony as appropriate and encourages the development of a substantial record to demonstrate both the positive and negative criteria.

V

The judgment of the Appellate Division is reversed and the Law Division's decision is reinstated. Comcast's application for a conditional use variance is granted.

*For reversal* and *reinstatement*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.