NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1394-16T3

BRIAN KIMMINS and PATRICIA
KIMMINS, his wife, JOSEPH
NATOLI, and JANICE NATOLI,
his wife, STEVEN HEGNA and
METTE HEGNA, his wife,
CHRISTIAN SIANO and CARRIE
SIANO, his wife, DANIEL
KEATING and DIANE KEATING,
his wife, EDWARD BREHM and
JODI BREHM, his wife,
CHRISTOPHER KAISAND and
KELLY KAISAND, his wife,
and PETER PETRACCO and MAY
PETRACCO, his wife,

 Plaintiffs-Respondents,

v.

BOROUGH OF BRIELLE PLANNING
BOARD,

 Defendant,

and

MICHAEL and LORI CENTRELLA,

 Defendants-Appellants.
________________________________

 Argued September 12, 2017 – Decided November 15, 2017

 Before Judges Hoffman and Mayer.
 On appeal from Superior Court of New Jersey,
 Law Division, Monmouth County, Docket No. L-
 2949-15.

 C. Keith Henderson argued the cause for
 appellants (C. Keith Anderson & Associates,
 attorneys; Mr. Henderson, on the briefs).

 Edward F. Liston, Jr. argued the cause
 respondents.

PER CURIAM

 Defendants Michael and Lori Centrella appeal from the October

28, 2016 Law Division order vacating the Borough of Brielle

Planning Board (Board) resolution, which granted defendants'

application to divide their existing single lot into three lots,

along with ancillary variance relief from municipal zoning

ordinances. We affirm.

 I.

 The following facts are relevant to our review. Defendants

purchased the subject property in 2001. Slightly larger than one

acre at 46,618 square feet, and 185.45 feet wide, the cork-shaped

property lies at the corner of two roads – one to the west and one

to the south, and adjacent to the Manasquan River to the east.

When defendants purchased the property, it contained a "main

dwelling," "a guest cottage," "a two-car garage," and "a large

swimming pool." Within a year of the purchase, defendants

demolished the main dwelling and swimming pool. In 2012, Hurricane

 2 A-1394-16T3
Sandy severely damaged the guest cottage, causing defendants to

move out of the cottage for almost one year.

 At the time of the Board's proceedings, defendants lived in

the guest cottage, which sits 2.57 feet from the northern property

line. Upon finalization of their subdivision plan, defendants

intended to build a house on the middle lot and tear down the

guest cottage.

 In November 2014, defendants applied to the Board for approval

to divide their property into three lots; notably, their

application required two variances. The Board addressed

defendants' application in a hearing that extended over three

Board meetings.

 On March 10, 2015, the first hearing date, defendants

presented testimony from two expert witnesses. The first expert,

a professional engineer and planner, testified the property needed

a "pre-existing nonconforming" variance for the "guest cottage"

because it sits 2.57 feet from the northern property line. He

also said defendants' plan required a variance because the southern

lot would measure only 34.23 feet wide, but the ordinance required

a minimum sixty-foot width; the other two lots would conform,

measuring 75.14 and 75.76 feet wide. He further noted the three

lots would nevertheless satisfy the ordinance's total-area

requirements.

 3 A-1394-16T3
 Defendants' second expert, a licensed professional planner,

addressed defendants' application for a variance under N.J.S.A.

40:55D-70(c)(1), which authorizes a board of adjustment to grant

a variance for "exceptional and undue hardship." He explained

defendants' plan would create

 three lots which fully conform with the
 exception of the fact that there is a
 technical lot width variance on the largest
 lot, the corner lot, . . . where if . . . you
 measure the lot width at the setback[,] it's
 . . . a little over 34 feet, and the ordinance
 requires 60 [feet]. But then when you look
 at the rest of the parcel, clearly, that
 parcel is substantially large. It's a very
 large building envelope on it. So it's
 clearly a lot that would be envisioned by your
 ordinance to be a buildable building lot.

He added, "[I]t's much more consistent with the character of the

zone than . . . what could be done with a fully conforming

subdivision." He therefore concluded, "[T]here is a practical and

undue hardship that is associated with the configuration of the

lot that inhibits the extent to which [defendants] can use the

property."

 The expert then discussed the application for a variance

under N.J.S.A. 40:55D-70(c)(2), which authorizes granting a

variance when "the benefits of the deviation would substantially

outweigh any detriment." He asserted defendants' plan did not

have any "substantial negative impacts." He explained the three

 4 A-1394-16T3
lots would "be very consistent with the character of the other

lots in this zone." He added that the plan would eventually get

rid of defendants' nonconforming "guest cottage," and would

further the purposes of Municipal Land Use Law (MLUL), N.J.S.A.

40:55D-2.

 At the conclusion of the testimony of defendants' second

expert, the Board opened the meeting to "any members of the public

[who] have questions." The Board did not inquire whether anyone

wanted to present any testimony or evidence regarding the

application. Nor did the Board announce the closure of the

evidentiary portion of the hearing. One member of the public

asked defendants' second expert some questions, but none of any

relevance to this appeal. The chairperson then said, "[W]e have

to open up for public comments[,] and there's a lot of people

here. I just don't feel like rushing people."1 He consequently

adjourned the proceedings.

 On April 14, 2015, the second hearing date, plaintiffs

attended with their attorney, who advised the Board that he

intended to have a public planner testify on plaintiffs' behalf.

The Board's chairperson responded, "This is the open public

1
 The record suggests the Board follows a general rule of
allocating forty-five minutes to an application; if not completed,
the Board adjourns the matter to their next meeting date.

 5 A-1394-16T3
meeting. There's no . . . section here for you to call your

planner. The other [section,] that was closed at the lasting

meeting. It was opened for public comment[,] and the comment was

on the testimony that was given prior." Plaintiffs' attorney

repeated his request to have plaintiffs' public planner expert

testify. The chairperson replied, "This is the public portion.

It's for public comment. The hearing portion of it was closed at

the last meeting. Everybody was noticed. Nobody showed up . . .

with a planner to oppose this."

 The attorney representing defendants then stated:

 What this Board may not be aware of[,] and
 what [plaintiffs' attorney] may not be aware
 of, too, is that the [o]bjectors had an
 attorney here last time. There was an
 attorney[,] [i]ntroduced himself, told me he
 was representing the [o]bjectors, and nothing
 was said. And so it is [not] as if they didn't
 have an opportunity before it was closed. It
 isn't as if they weren't represented by
 counsel. Counsel chose, for whatever reason,
 not to make an appearance before the Board.
 He was here[,] and he introduced me as having
 represented the same people.

Contrary to the representation of defendants' attorney, the

transcript does not indicate the Board ever closed the evidentiary

portion of the hearing.

 After plaintiffs' attorney raised an issue regarding

jurisdiction, Brielle's mayor — a member of the Board —

interjected, and said, "I'm going to make the following suggestion

 6 A-1394-16T3
. . . . I cannot see jeopardizing the Borough's position at this

point . . . . I would suggest that we adjourn . . . this portion

of the hearing until next meeting to give our legal and engineering

experts time to review these questions[,] . . . and then we proceed

next month." The Board agreed and postponed the hearing "to the

next meeting."

 On June 9, 2015, the third hearing date, the Board's recording

secretary asked defendants whether they wanted to present any

"testimony[,] . . . and the answer was no."2 The chairperson "then

turned to [plaintiffs' attorney] and told him the public portion

of this hearing was closed[,] and no further testimony will be

heard." The chairman then announced, "[T]he Board is asking that

each person speak for [three] minutes only so everyone who wishes

can make a comment."

 Plaintiffs' attorney reiterated his request to have

plaintiffs' expert testify, and noted the expert "is a resident

of Brielle." The Board rejected the request and approved "a motion

to allow public comments only" on the testimony already given.

Plaintiffs' counsel then asked the Board to give his planner more

2
 After the audio recording for the third meeting proved defective,
the parties stipulated the court and counsel "shall rely on the
official minutes of the June 9, 2015 Meeting of the Borough of
Brielle Planning Board as well as planning testimony outline of
[p]laintiff's [e]xpert."

 7 A-1394-16T3
than three minutes to speak. When plaintiffs' counsel asked to

mark charts he brought for identification, the mayor responded

"there is no more testimony." Plaintiffs' counsel said his clients

"were being denied their right to present their case[,] and this

is a denial of their Constitutional rights."

 The Board proceeded to hear "public comment" from eight

residents, six who opposed the application and two who spoke in

favor of it. The Board then voted on whether to approve

defendants' application, with five members voting yes and two

members voting no.

 On July 14, 2015, the Board adopted a resolution granting

defendants' application for the subdivision and two variances.

The Board concluded defendants were "entitled to C1 relief due to

the features existing which uniquely affect this specific piece

of property and due to peculiar and exceptional practical

difficulties to, or exceptional and undue hardship upon the

developer of such property." The Board reasoned:

 [A]s it relates to the first requested
 variance, there is a preexisting conformity
 [sic] as it relates to the guest house which
 lawfully exists on the lot and that,
 furthermore, this existing condition will be
 extinguished once the guest house is
 demolished per [defendants'] stated
 intention. As it relates to the second
 aforementioned variance, the Board notes that
 because of the width of the lot adjacent to
 [the western street], one would not be

 8 A-1394-16T3
 permitted to have four (4) conforming lots,
 an issue which presents a hardship. Nothing
 can be done to increase the frontage along
 [the western street]. Given the unique pie-
 shaped dimensions of the subject parcel, the
 Board further notes [defendants have] sought
 to create three (3) lots which fully conform
 to the [z]oning ordinance, with the exception
 of the lot width variance on . . . the corner
 lot. The Board notes that it would be
 impossible for [defendants] to acquire
 additional property in order to meet the lot
 width requirements in the R-3 Zone. The Board
 concludes that there is a practical hardship
 associated with the configuration of the lot
 that inhibits the extent to which [defendants]
 can use the property, a hardship which
 satisfies the C-1 criteria. The Board further
 concludes that no substantial negative impact
 exists on this application sufficient to
 negatively impact the surrounding properties
 or the zone plan in a meaningful way. In this
 instance, the Board concludes that these
 properties can be developed in such a manner
 as to meet all of the setback criteria, height
 criteria, and in such a manner as to be
 consistent with surrounding properties and
 homes on properties. There is a positive
 reason for nonconformity to continue. Thus,
 any developed lots will meet all of the
 requirements in the R-3 Zone with the
 exception of the lot width variance on [the
 corner lot] as previously indicated.

 The Board also concluded, "[U]nder the C2 analysis[,] . . .

the positive and negative criteria were met by [defendants,] and

the granting of 'C' variance relief as set forth herein is

appropriate." It reasoned:

 [W]hen taking into account the current
 character of the R-3 Zone as it extends
 between [the western street] and the Manasquan

 9 A-1394-16T3
 River, every single lot in that zone runs from
 the street through to the [r]iver with
 waterfront frontage, and that furthermore,
 within this area there are fifteen (15) other
 lots, of which seven (7) have nonconforming
 lot widths. The Board determines that
 approval of this application represents a
 better zoning alternative for the property
 which benefits the community. The Board also
 points out that preliminarily[, defense
 counsel] intimated [defendants] might seek a
 subdivision of four (4) lots, but that since
 that time [defendants have] filed an
 [a]pplication seeking a minor three (3) lot
 subdivision. The Board determined that having
 fewer lots with a larger lot area makes better
 planning sense and will not be in conflict
 with the nature and character of the R-3 Zone
 as presently developed.

 On August 5, 2015, plaintiffs filed an action in lieu of

prerogative writs in the Law Division, challenging the Board's

decision. After conducting a hearing, the court reversed the

variances granted by the Board, and vacated "the remainder of the

Board's decision" and remanded the matter for further proceedings.

The court concluded the Board's findings relating to the variances

"are without legal or factual support." The court further

concluded, "A review of the record reveals the Board failed to

conduct the hearing consistent with principles of due process and

fundamental fairness. By denying [o]bjectors the right to present

expert testimony, the Board's decision resulted in an unfair

outcome, warranting reversal."

 10 A-1394-16T3
 II.

 Zoning boards make quasi-judicial decisions to grant or deny

applications within their jurisdiction. Willoughby v. Planning

Bd. of Deptford, 306 N.J. Super. 266, 273 (App. Div. 1997);

Kotlarich v. Mayor of Ramsey, 51 N.J. Super. 520, 540-41, (App.

Div. 1958). The determination of a zoning board is presumed to

be valid. Kramer v. Bd. of Adjustment, 45 N.J. 268, 285 (1965);

Cell S. of N.J. v. Zoning Bd. of Adjustment, 172 N.J. 75, 81

(2002). The court's review of a board's decision is based solely

on the record before the board. Kramer, supra, 45 N.J. at 289.

A court must not substitute its own judgment for that of the board

unless there is a clear abuse of discretion. See Cell S. of N.J.,

supra, 172 N.J. at 81. The burden is on the challenging party to

demonstrate that the board's decision was arbitrary, capricious,

or unreasonable. New Brunswick Cellular Tel. Co. v. Borough of

S. Plainfield Bd. of Adjustment, 160 N.J. 1, 14 (1999); Smart SMR

of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J.

309, 327 (1988); Cell S. of N.J., supra, 172 N.J. at 81.

 This court applies the same standards as the trial court.

Bressman v. Gash, 131 N.J. 517, 529 (1993); D. Lobi Enters., Inc.

v. Planning/Zoning Bd., 408 N.J. Super. 345, 360 (App. Div. 2009).

However, when an appeal raises a question of law, we apply a

 11 A-1394-16T3
plenary standard of review. Wyzykowski v. Rizas, 132 N.J. 509,

518 (1993).

 A.

 We first address defendants' argument that the trial court

erred when it concluded the Board's hearing denied plaintiffs due

process. Defendants assert the Board complied with due process

throughout these proceedings.

 N.J.S.A. 40:55D-10(d) states:

 The testimony of all witnesses relating to an
 application for development shall be taken
 under oath or affirmation by the presiding
 officer, and the right of cross-examination
 shall be permitted to all interested parties
 through their attorneys, if represented, or
 directly, if not represented, subject to the
 discretion of the presiding officer and to
 reasonable limitations as to time and number
 of witnesses.

Planning boards have the obligation "to afford . . . all objectors

a fair opportunity to address the full range of planning issues"

presented by development applications. Witt v. Borough of Maywood,

328 N.J. Super. 432, 454 (Law Div. 1998), aff'd o.b., 328 N.J.

Super. 343 (App. Div. 2000), citing N.J.S.A. 40:55D-10(d).

 Although an attorney representing some plaintiffs may have

attended the first Board hearing, the transcript of the proceedings

contains no confirming evidence. During the second proceeding,

the Board refused to allow plaintiffs to present an expert on

 12 A-1394-16T3
their behalf, and adjourned the proceeding without hearing any

public comments. At the beginning of the third proceeding, the

Board secretary asked defendants' attorney "if he had any new

testimony to present and the answer was no." When plaintiffs'

counsel asked to call their expert, the planning board refused to

permit it. When a planning board allows an applicant to present

testimony but denies objectors "a fair opportunity [to] present

all of their witnesses[,] [it] deprives the ultimate conclusion

of legitimacy." Witt, supra, 328 N.J. Super. at 454 (Law Div.

1998).

 Before the trial court, the Board's attorney argued that the

Board had the right to "make the rules governing" its hearings,

pursuant to N.J.S.A. 40:55D-10(b). The trial court rejected this

argument, noting that:

 [A] review of the record reveals that if there
 were rules, they were not known to all who
 appeared, as the [o]bjectors were "surprised
 by the order of the proceedings."

 A review of the transcript makes it perfectly
 clear that the Board never advised the public
 that objectors were required to sign a book
 or give notice that they wished to call
 witnesses in advance of the hearing.

 Although the Board had the discretion to set "reasonable

limitations" as to the number of witnesses and how long they could

testify, N.J.S.A. 40:55D-10(d), it abused its discretion when it

 13 A-1394-16T3
refused to allow plaintiffs to present even a single expert witness

to oppose defendants' two experts. See Witt, supra, 328 N.J.

Super. at 454 (Law Div. 1998). We agree with the trial court that

"the record reveals the Board failed to conduct the hearing

consistent with principles of due process and fundamental

fairness," warranting reversal of the Board's decision.

 B.

 We next address defendants' argument that the record lacks

support for the trial court's conclusion that the Board improperly

granted defendants' requested variances.

 "An applicant who pursues a variance under N.J.S.A. 40:55D-

70(c)(1) must establish that the particular conditions of the

property present a hardship." Ten Stary Dom P'ship v. Mauro, 216

N.J. 16, 29 (2013); see also N.J.S.A. 40:55D-70(c)(1). "'Undue

hardship' involves the underlying notion that no effective use can

be made of the property in the event the variance is denied."

Commons v. Westwood Zoning Bd. of Adjustment, 81 N.J. 597, 605

(1980).

 "Thus, [(c)(1)] variance approval require[s] the party

requesting the variance to prove both positive and negative

criteria: there must be a benefit to the community from granting

the variance that outweighs the detriment to the zoning plan, and

 14 A-1394-16T3
the purposes of the MLUL must be advanced." Borough of Saddle

River v. 66 E. Allendale, LLC, 216 N.J. 115, 125 n.4 (2013).

 "A 'c(1)' variance is not available to provide relief from

self-created hardship." Green Meadows at Montville, LLC v.

Planning Bd. of Montville, 329 N.J. Super. 12, 22 (App. Div. 2000).

An applicant may not claim an undue hardship when the applicant

seeks to divide the lots "in such a way as to make [the] lots

nonconforming." Ibid.

 If the applicant created the hardship, the planning board may

nevertheless grant a variance under N.J.S.A. 40:55D-70(c)(2).

Ibid. In Wilson v. Brick Twp. Zoning Bd. of Adjustment, 405 N.J.

Super. 189, 198 (App. Div. 2009), this court stated that in order

to secure variance relief pursuant to N.J.S.A. 40:55D-70(c)(2),

the applicant must show:

 (1) [that the variance] relates to a specific
 piece of property; (2) that the purposes of
 the [MLUL] would be advanced by a deviation
 from the zoning ordinance requirement; (3)
 that the variance can be granted without
 substantial detriment to the public good; (4)
 that the benefits of the deviation would
 substantially outweigh any detriment[;] and
 (5) that the variance will not substantially
 impair the intent and purpose of the zone plan
 and zoning ordinance.

 [Ibid. (quoting William M. Cox, New Jersey
 Zoning and Land Use Administration, § 6-3.3
 at 143 (Gann 2008)).]

 15 A-1394-16T3
 Defendants argue their "'hardship' arises not from an act of

[their own or] their predecessors in title, but rather from the

shape of the property." (Db22) They argue a "(c)1 [d]efendant

need only prove that [the] property's unique characteristics

inhibit 'the extent' to which the property can be used." They

cite Bressman v. Gash, 131 N.J. 517, 529-30 (1993), in which our

Supreme Court concluded the applicant suffered a hardship when

"the physical characteristics of the lot both precluded

construction of a house consistent with the character of the

neighborhood and constituted a sufficient hardship to support the

grant of a c(1) variance." They also cite Lang v. Zoning Bd. of

Adjustment, 160 N.J. 41, 61 (1999), in which our Supreme Court

concluded the applicant suffered a hardship when:

 it was not the size of the proposed pool, but
 rather the unusual narrowness of the
 applicant's property in relation to the
 ordinance's minimum width and the width of
 properties in the vicinity, combined with the
 existing structures on the property, that
 constituted the reasons why the setback and
 area variances were required.

The Court further noted a "misconception about the term 'undue

hardship[]' . . . is the belief that an applicant seeking a

variance under subsection c(1) must prove that without the variance

the property would be zoned into inutility." Id. at 54. Instead,

a hardship inhibits "the extent to which the property can be used."

 16 A-1394-16T3
Id. at 55 (quoting Davis Enters. v. Karpf, 105 N.J. 476, 493 (1987)

(Stein, J., concurring)).

 Defendants misinterpret both Bressman and Lang. In each

case, the applicant sought a variance to build on a single lot.

They did not seek to divide a lot into nonconforming lots, as

defendants propose to do. Defendants have only established the

hardship that they cannot divide their single, useful lot into

three new lots, one of which fails to conform to Brielle's zoning

ordinances. Without the subdivision they seek to create, the

shape of the lot fails to limit their use of the property. Green

Meadows at Montville, LLC, supra, 329 N.J. Super. at 22, is

directly on point: defendants may not claim an undue hardship when

they seek to divide the lots "in such a way as to make [the] lots

nonconforming."

 Defendants also argue they "satisfied their burden of proof

to justify relief under" N.J.S.A. 40:55D-70(c)(2). We disagree.

 Defendants first requested a variance for their "guest

cottage." The Board found, "[T]here is a preexisting conformity

[sic] as it relates to the guest house which lawfully exists on

the lot and that, furthermore, this existing condition will be

extinguished once the guest house is demolished per [defendants']

stated intention." The trial court correctly concluded the record

does not support a finding of when the "guest cottage" was built

 17 A-1394-16T3
or when the zoning ordinance rendering it nonconforming was passed.

Without those facts, the planning Board could not find the "guest

cottage" constituted a preexisting condition.

 With respect to the lot-width variance, the planning Board's

resolution does not explain the purpose of the lot-width

requirement or how the variance would further that purpose. The

planning Board's resolution also fails to explain how the variance

would further the purposes of the MLUL. We agree with the trial

court that the Board's findings relating to the variances "are

without legal or factual support."

 Affirmed.

 18 A-1394-16T3