823 A.2d 87 (2003)
360 N.J. Super. 373
SPRINT SPECTRUM, L.P., Plaintiff Respondent/Cross Appellant,
v.
ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF LEONIA, Defendant Appellant/Cross Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 9, 2003.
Decided May 28, 2003.
*88 William F. Rupp, Hackensack, argued the cause for appellant.
*89 Gregory D. Meese, Woodcliff Lake, argued the cause for respondent/cross-appellant (Price, Meese, Shulman & D'Arminio, attorneys; Mr. Meese and Jeffrey L. Love, on the brief).
Before Judges SKILLMAN, LEFELT and WINKELSTEIN.
The opinion of the court was delivered by WINKELSTEIN, J.A.D.
In this opinion we examine the reasonableness of a zoning board's denial of a telecommunications carrier's use variance request. Plaintiff Sprint Spectrum, L.P., applied to the Borough of Leonia Board of Adjustment (Board) for a variance to affix nine small antennas to the roof of an existing five-story apartment building located in a residential zone. The Board found that the introduction of the telecommunications equipment was contrary to the Borough's master plan and zoning plan and, accordingly, denied the application. The Law Division reversed, granting Sprint use, height and rear yard variances. The Board has appealed.[1] Because the proposed telecommunications facilities will serve the general welfare, its benefits to the public will outweigh its potential detriments, and locating the equipment in a residential zone will not substantially impair the intent and purpose of the zone plan or ordinance, we affirm the Law Division.

I
Sprint is licensed by the Federal Communications Commission (FCC) to provide wireless telecommunications services known as personal communication services (PCS). It has applied for use, height and rear yard variances[2] to construct telecommunications facilities on the roof of a building at 222 Christie Street in Leonia. The property is an irregularly-shaped lot located on the corner of Christie Street and Broad Avenue, and improved with a five-story residential apartment building. The lot is located partially within, the A-4 Single Family Residential zoning district, and partially within the B Multiple Family Residential zoning district.
Sprint seeks to install nine wireless antennas, along with an equipment platform, cabinet modules, cell equipment and fans, on the apartment building roof. The antennas are approximately 48 inches long, 8 inches wide, and 2.5 inches thick.
Single-family residences are located west of and directly across Broad Avenue from the property. To the north, 500 to 1100 feet from the property, lies the business zoning district. South of the multiple-family zoning district along Broad Avenue are single-family zoning districts.
The apartment building is set back twenty-five feet from Broad Avenue, and approximately ten feet from Christie Street. The application requires a use variance because telecommunications equipment is not permitted in any zone in *90 the municipality.[3] Although the maximum height permitted in either the A-4 or B zone is 35 feet, the existing building rises approximately 60 feet above grade; installation of the antennas will not extend beyond the height of the parapets on the roof. A rear yard setback variance is necessary because three of the antennas would be set back 7.6 feet from the property line, while the zoning district requires a 35-foot setback.

II
The Board held four hearings between October 2000 and March 2001. Sprint presented the testimony of Anthony Suppa, a licensed professional engineer Francisco Paradas, a radio frequency engineer; Jeffrey Stiles, a professional planner; and Ronald Peterson, an expert in the field of radio frequency safety. The Board retained its own expert, Ross Sorci, an electrical and computer engineer. Because the experts' testimony is critical to whether Sprint proved its entitlement to a use variance, we will set forth the experts' testimony in some detail. Suppa testified that because the antennas provide for line-of-sight communications, they need to be highly elevated. As a consequence, one of the reasons this site was selected is because the ground elevation of the building is 120 feet, making the top of the parapets approximately 175 feet above grade. The proposed antennas would rise no higher than the parapets and a dumbwaiter that is already located on the roof.
All antennas would be camouflaged or shielded. "Three antennas, in the northwest corner of the building, would be flush-mounted on the stairwell wall and painted to match. They would not be visible from the street, nor would they extend higher than the top of the wall. Three additional antennas, located on the north" east side of the building, would be flush-mounted to the front of the building, and would not exceed the height of the building. They would be painted to match the existing brick. A 26 by 9 foot equipment platform and three antennas would be placed on the roof, surrounded by an 8-foot-high screen. Those three antennas would be painted to match the color of the screen and would be 7.6 feet from the edge of the building, violating the setback limitations. The equipment would not, however, be visible from the street. The antennas would be clamped to the steel bottom of the platforms.
Sprint also proposed placing five equipment' cabinets, which look like "small refrigerators," on the roof, each approximately 5 feet high, and 2½ feet in width and depth. The facilities would not be manned. They would be visited approximately once every four weeks by a technician, and would also be monitored seven days per week, twenty-four hours per day by computer.
The roof can support the weight of the telecommunications equipment, which could withstand 125 mile-per-hour winds. All of the equipment would have an alarm tied to the Sprint network, so if tampered with, Sprint would know immediately and dispatch a technician. The telecommunications equipment would not contain any hazardous material.
Paradas, a Sprint PCS employee, testified as an expert radio frequency engineer. He explained that because radio waves extend out horizontally and then descend, coverage is affected by the surrounding *91 topography and by the height of the antennas. He testified that although Sprint has three sites in the surrounding areas, in Englewood, Fort Lee, Palisades Park, and a proposed site in Teaneck, Leonia experiences a gap in reliable coverage.
Paradas said that when looking for a site, "the first thing we look for is existing structures, like existing towers. And then second, rooftops." He testified that Sprint had considered other locations, but they were insufficient to fill the gap in coverage. Yet, he also acknowledged that Sprint concentrated on the subject location which was located in the center of the gap, and provides the needed coverage. He added that due to the ground elevations of the surrounding terrain, use of other locations may not correct the gap in coverage. If the antennas were located north or south of the site, higher antennas would be needed because the site elevation would not be as high as the Christie Street property. He said using two separate antennas in other locations would be insufficient to fill the gap in coverage.
Based on data obtained while driving through the coverage area, a computer produced a map showing the gaps in coverage. Alluding to the map, Paradas explained that the existing Sprint sites did not afford cell phone users full coverage in the Borough; meaning that in Leonia the calls were "going to drop" or the cell phone was "not going to be able to accept calls." He also testified that the radio frequency used by the equipment would not interfere with any other electronic devices, and the facility would be tied to 911 service which would allow emergency personnel to accurately locate cell phone users in that area.
Sprint's professional planner, Jeffrey Stiles, discussed the suitability of the site for the telecommunications equipment. He said the license issued by Sprint requires it to provide reliable seamless coverage throughout its entire licensed area. Accordingly, the site, which has a higher elevation than the surrounding area, fits within a network of other nearby sites to provide the appropriate overlap in coverage. He acknowledged that the proposed site was located entirely in a residential zone, but opined that the commercially-zoned areas in Leonia were unsuitable for the equipment because they were located downhill from the site and could not provide the necessary height to fill the coverage gap, and consequently, no nearby sites in nonresidential neighborhoods were suitable for the antennas. He said placing an antenna in the commercial district might partially ameliorate the coverage problem, but some areas would remain without coverage.
He testified that the telecommunications equipment constituted an inherently beneficial use, with the licensing by the FCC satisfying the positive criteria. As for the negative criteria, he noted that the radio frequency emissions would fall well below FCC regulations, and the equipment would be barely visible to the public. The equipment meets all building codes and requires no municipal services; it is unmanned and generates no noise, light, noxious fumes, or traffic. He considered the facilities to be a benign use.
Stiles considered the visual effect of the telecommunications equipment on the neighborhood to be insignificant. He said moving the equipment to another location would require a more visible antenna. If the antennas were not placed on the subject site, the only alternative would be to build a new structure, either a very high monopole or tower. He also claimed that tree poles, which are ground poles with "fake tree limbs affixed" to hide the antennas, which usually rise 70-90 feet above ground level, would have "substantially *92 more impact upon [Leonia] than placing the antennas ... on a rooftop."
He discussed the likelihood of locating antennas at the Borough fire hall or on a building in Palisades Park, rather than on the subject site. The site where the fire hall is located, in a Park zone, would also require a use variance. The lot is "very tight," and Stiles was unsure whether it was amenable to the construction of a monopole or tower, which would be needed because of the building's height and location. He also testified that the proposed Palisades Park site would require a use variance because the Palisades Park zoning ordinance did not permit telecommunications facilities anywhere in the municipality. Additionally, the Palisades Park building upon which the facilities would have to be constructed has four to five floors of residential use above the commercially-used ground floor. Stiles said the Christie Street property was the best site available based on cost, aesthetics and impact on the surrounding area.
Ronald Peterson, Sprint's radio frequency safety expert, testified that the antennas would meet FCC emission standards, and that the maximum signal strength would be less than 1.1 percent of FCC safety guidelines. He emphasized the antennas would pose no danger to the residential units in the building on which the antennas were located, or to the adjacent building.
After reviewing the materials submitted by Sprint, the Board's expert, Ross Sorci, agreed that Sprint had demonstrated a gap in coverage in Leonia and that a telecommunications site was needed to fill that gap. He acknowledged that Sprint's method for determining the gap in coverage was the industry-accepted standard and the most accurate way of determining whether additional coverage was necessary. He confirmed Sprint had "a valid need" for a site in the Borough to cure the problem.
He testified that because only the Christie Street property and the property next door to it were evaluated by Sprint before it submitted its variance application, he asked Sprint to assess other sites. The two sites identified were the fire hall in Leonia and the Palisades Park property. Although Sorci said the sites would work technically as well as the Christie Street property, he had no information as to whether the sites were available. Furthermore, due to their locations, the two additional sites could each require tall monopoles, perhaps as high as 80 to 100 feet high, as compared to the much smaller antennas Sprint intended to append to the existing Christie Street structure. Sorci testified that having one site would be better than having two, and he would pick the Christie Street site from a technical and cost-effective standpoint.
Sorci physically toured the area of the Christie Street site. The only other building that may have been suitable for construction of telecommunications equipment was another apartment building. He also testified that for technical reasons, Sprint could not co-locate its telecommunications equipment with sites used by other telecommunications carriers. He confirmed that in the absence of placing the equipment on the subject apartment building, or the apartment building next door to the subject site, Sprint would have to construct a tower high enough to fill the gap in coverage, or use multiple sites, or both.

III
In denying the application on March 21, 2001, one board member concluded there was no substantial proof of a gap in service; others said that alternate sites had not been sufficiently explored.
*93 In a resolution adopted on April 26, 2001, the Board found that Sprint had established that there is a gap in coverage and a need for another site to cover that gap. However, the Board found that while the Christie Street property was technically suited for the proposed installation, it was not suitable from a zoning perspective. Specifically, the Board made the following findings:
[T]here is a gap in acceptable coverage for which an additional PCS transmitting facility is required.
[H]owever, ... the proposed location... is neither the only location to alleviate the gap nor necessarily the best location.... [T]he applicant's testimony respecting the particular suitability of the ... site was motivated primarily by convenience (so the applicant need not explore other alternative locations) and cost (to avoid the cost of multiple locations and the cost of a tower or pole). [S]uch convenience and cost saving to the applicant does not, from a zoning perspective, render the proposed site... particularly suitable. [T]he testimony of the applicant's planner, Jeffrey D. Stiles, was not credible.... Stiles' claim that the proposed site was particularly suitable for a telecommunications facility is belied by his own testimony that such a facility should preferably be located in commercial or industrial zones and his acknowledgment that the proposed site was surrounded by residences and residential zoning districts for a minimum distance of between 900 and 1,100 feet.

* * *
Sprint holds an FCC license and ... an additional PCS facility to alleviate the gap in coverage or service serves the general welfare.

* * *
[T]he chosen site is [not] particularly suited for the proposed use. The subject property is located within both A-4 Single Family Zoning District and the B Multi-Family Zoning District. Moreover, it is surrounded by other residential uses, single family residential uses to the east and the west and multi family uses to the north and south.... [T]he subject premises are immediately adjacent and attached to and adjoining multi-family dwellings to the south. The proposed antennas are setback a mere 7.6 feet from the adjoining multi-family residential dwelling units and the eight foot high screened platform, cell modular, equipment and antennas are visible from the upper story windows of the adjoining property.
The proposed telecommunications facility would be more appropriately located in either the Industrial Zone or Commercial Zone of the Borough....
[T]he applicant failed to identify and analyze other potential sites within more appropriate zoning districts.... The unrefuted testimony was that a tower at [the property currently housing the Borough's fire department], coupled with an installation atop a building located within a commercially-zoned area in Palisade Park would provide the coverage necessary to address the coverage or service gap.
In applying the ... balancing test, ... the applicant has failed to demonstrate that the proposed residential site ... is particularly suitable for use as a telecommunications facility.... [C]ommercially zoned areas ... are suitable to provide adequate coverage in the "gap."... [T]he ... proposed telecommunications facility is contrary to the intent and purpose of the Master Plan and the *94 Zoning Ordinance. The mere showing... that its proposed telecommunications facility would comply with FCC requirements, that it has a license, and that the location ... would provide an adequate level of coverage within the "gap" does not outweigh the negative criteria as to the incompatibility with the Master Plan and the Zoning Ordinance, particularly in view of the fact that such telecommunications facilities could be located within commercially zoned areas which would meet the coverage requirements.

IV
Judicial review of a zoning board's decision is ordinarily limited. Ocean County Cellular Tel. Co. v. Township of Lakewood Bd. of Adjustment, 352 N.J.Super. 514, 521, 800 A.2d 891, (App. certif. denied, 175 N.J. 75, 812 A.2d 1108 (2002). A board's decision "`is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable.'" Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327, 704 A.2d 1271 (1998) (quoting Sica v. Bd. of Adjustment of Township of Wall, 127 N.J. 152, 166-67, 603 A.2d 30 (1992)).
N.J.S.A. 40:55D-70d governs use variances. It states:
d) In particular cases for special reasons, grant a variance to allow departure from regulations ...
No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

[Ibid.]
Under the statute, it is necessary to show both positive and negative criteria. Sica, supra, 127 N.J. at 156, 603 A.2d 30. The positive criteria require proof of "special reasons," and the negative criteria require proof that the variance will not cause "substantial detriment" or "impair the intent and the purpose of the zone plan." N.J.S.A. 40:55D-70d; Sica, supra, 127 N.J. at 156, 603 A.2d 30. Generally, to satisfy the positive criteria, an applicant must prove that "the use promotes the general welfare because the proposed site is particularly suitable for the proposed use." Medici v. BPR Co., 107 N.J. 1, 4, 526 A.2d 109 (1987).
Special reason variances are divided into two categories. New York SMSA Ltd P'ship v. Bd. of Adjustment of Township of Bernards, 324 N.J.Super. 149, 158, 734 A.2d 817 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999). The first category is where the proposed use is inherently beneficial. See Sica, supra, 127 N.J. at 159, 603 A.2d 30. If the proposed use is inherently beneficial, the use does not have to be particularly suited to the site, New York SMSA supra, 324 N.J.Super. at 159, 734 A.2d 817, because inherently beneficial uses intrinsically serve the general welfare. See Medici, supra, 107 N.J. at 12-13, 526 A.2d 109. The second category is where the proposed use is not inherently beneficial. New York SMSA, supra, 324 N.J.Super. at 159, 734 A.2d 817. In that case, the party seeking the variance must satisfy the positive criteria showing that "the proposed site is particularly suitable for the proposed use." Medici supra, 107 N.J. at 4, 526 A.2d 109; see also Smart SMR, supra, 152 N.J. at 331-32, 704 A.2d 1271.
In Smart SMR, supra, the New Jersey Supreme Court held that wireless *95 communications facilities such as a cell tower or monopole are not an inherently beneficial use. 152 N.J. at 329, 704 A.2d 1271; see also Cell South of N. J., Inc. v. Zoning Bd. of Adjustment of W. Windsor Township, 172 N.J. 75, 84, 90, 796 A.2d 247 (2002) (reaffirming Smart SMR). Therefore, an applicant seeking to construct a new cell tower must show that the site is particularly suited for the use. Smart SMR, supra, 152 N.J. at 331-32, 704 A.2d 1271.[4]
Providing guidelines to local boards and the courts when deciding cases involving the location of telecommunications facilities, the Smart SMR Court noted:
[W]hether or not a radio transmission tower or monopole will substantially impair the character of a neighborhood will depend on the circumstances of each case.

* * *
Generally, the issuance of an FCC license should suffice for a carrier to establish that the use serves the general welfare. Nonetheless, if a telecommunications facility requires construction of a tower or monopole, the applicant must prove that the site is particularly suited for that use.... Proof of an adverse effect on adjacent properties and on the municipal land use plan, moreover, generally will require qualified expert testimony.
[Id. at 331, 336, 704 A.2d 1271]. Nevertheless, the test espoused by the Court weighs, as it would with an inherently beneficial use, "the positive and negative criteria and determine[s] whether, on balance, the grant of the variance would cause a substantial detriment to the public good." Id. at 332, 704 A.2d 1271 (quoting Sica, supra, 127 N.J. at 166, 603 A.2d 30).

V
Against this backdrop, we first address the positive criteria under N.J.S.A. 40:55-70d. The Board concluded that the proposed use was not inherently beneficial, and the use was not particularly suited for the site. Sprint urges that we find the proposed use is inherently beneficial because Sprint is not constructing either a monopole or a tower, but rather is adding antennas to an existing structure. Sprint argues that in such a case the FCC license alone satisfies the positive criteria. However, we need not decide whether adding telecommunications equipment to an existing structure rather than constructing a freestanding tower or monopole renders the use inherently beneficial, because in this case Sprint has demonstrated that the proposed telecommunications facilities are particularly suited for the proposed site.
The Board found that Sprint holds an FCC license "and that an additional PCS facility to alleviate the gap in coverage or service serves the general welfare." We will therefore focus our analysis on the suitability of the use to the proposed site. Doing so, we begin by examining existing case law.
We start with Smart SMR, supra, where the mobile communications carrier sought to erect a 140-foot monopole in an area that already contained a 90-foot monopole. 152 N.J. at 316-17, 704 A.2d 1271. The owners of the preexisting monopole offered to remove it and co-locate their antennas on the new monopole. Id. at 320, 704 A.2d 1271. Concluding that the *96 50-foot increase in the height of a monopole would not "substantially alter [the municipality's] skyline," the Court found the use was particularly suited for the site because the site was zoned for industrial use; centrally located within Smart's telecommunications system; and already accommodated an existing 90-foot monopole constructed by another carrier. Id at 332-33, 704 A.2d 1271. Based on these factors, and that the carrier had an FCC license, the Court concluded that Smart had "proved that its mobile telecommunications facility serves the general welfare and satisfies the positive criteria." Id. at 332, 704 A.2d 1271.
In AWACS, Inc. v. Clementon Zoning Bd. of Adjustment, 160 N.J. 21, 23, 733 A.2d 453 (1999), the carrier, Comcast, sought to construct a 100-foot monopole and a 465 square foot building on a 4.4 acre lot in a commercial zone. The site adjoined a highway and was near both a residential zone and a home improvement store. Ibid. The carrier satisfied the positive criteria based upon its FCC license; "uncontroverted testimony establishing the need for additional service in the area"; its location in a commercial zone; and that it was "well situated" within the carrier's system to deliver the necessary service. Id. at 25, 733 A.2d 453.
The Court in New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd, of Adjustment, 160 N.J. 1, 14-15, 733 A.2d 442 (1999), found the carrier had demonstrated its need for a cell tower at the proposed location based upon the carrier's demonstration that the site would redress the existing lack of capacity in the area; the monopole would "facilitate the `hand off of signals from other telecommunications facilities"; the carrier could not use existing telecommunications facilities previously constructed at alternative sites; and the site was located in an industrial zone. See also Cell South, supra, 172 N.J. at 89, 796 A.2d 247 (finding unreasonable the zoning board's denial of application to take down an 83-foot tower and replace it with 152-foot monopole).
Also instructive is Ocean County Cellular, supra, which is factually similar to this case because, rather than seeking to construct a freestanding" monopole or tower, the carrier sought to erect twelve antennas on the top of a 45-foot high preexisting building. 352 N.J.Super. at 519-20, 800 A.2d 891. The antennas were 48 inches high, 6 to 8 inches wide, and approximately 6 inches deep, and would extend approximately 7 feet above the penthouse roof. Id. at 520, 800 A.2d 891. The testimony was that the proposed antennas were similar to the types of appurtenances normally found on rooftops, such as antennas for televisions and radios. Id. at 526, 800 A.2d 891. The building upon which the antennas were to be constructed served as a residence for 1000 rabbinical students, and a school facility attended by approximately 400 children. Id. at 520, 800 A.2d 891. The zone in which the building was located was mixed residential, office professional or hotel district, which included among its principal uses professional offices, houses of worship and residential dwellings. Id. at 519, 800 A.2d 891.
The zoning board denied the application, and we reversed, finding that the carrier had met both the positive and negative criteria. Ibid. The positive criteria underlying the decision included: the building was located in the center of the area which was experiencing blocked cellular phone calls; the zone included a mixture of uses, including professional offices, schools, houses of worship, and both single and multi-family dwellings; and the carrier intended to utilize an existing structure, rather than construct a monopole or tower. Id. at 526, 800 A.2d 891.
*97 In addition to the factors enumerated in these cases, addressing the "particularly suited" issue also implies "special considerations when the proposed use is a telecommunications system." Id. at 523, 800 A.2d 891. One of those special considerations is the Telecommunications Act (TCA), 47 U.S.C.A. § 332. Under the TCA, "the regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C.A. § 332(c)(7)(B)(i)(II). As the Court stated in Smart SMR, supra, "[a] telecommunications facility is a paradigm for a use that serves a greater community than the particular municipality." 152 N.J. at 332, 704 A.2d 1271. A Board must give weight to the TCA's requirement that "state and local regulations or zoning board decisions concerning the placement of wireless service facilities `shall not prohibit or have the effect of prohibiting the provision of personal wireless services.'" Ocean County Cellular, supra, 352 N.J.Super. at 530, 800 A.2d 891 (quoting 47 U.S.C.A. § 332(c)(7)(B)(i)(II)).
When we apply the factors described in the cases along with the requirements of the TCA to this case, we conclude that Sprint adequately demonstrated the positive criteria. To begin with, both the Board and Sprint agreed that placing the telecommunications facilities at the subject site would serve the general welfare. Sprint is licensed by the FCC. Sprint's method to determine the gap in coverage was accurate and accepted in the industry, and it had "a valid need" for telecommunications facilities to cure the problem. Placing the telecommunications facilities on the subject property would provide the needed coverage. Said another way, there exists no serious dispute that the Christie Street property is in the center of the area that has a gap in coverage, and the proposed telecommunications antennas will provide the needed service. Where Sprint and the Board differed was the Board's conclusion that the site's location, in a residential zone, and Sprint's failure to seek alternate proposed locations, rendered the use not particularly suited for the site. The Board's conclusion, however, is not reasonably supported by the evidence.
First, because the Borough does not have a zone which permits this use, a use variance would be necessary regardless of where in the Borough the telecommunications facilities are located. As a result, Sprint attempted to locate a suitable site. In so doing, the unrefuted expert testimony was that there were no existing buildings or other structures in non-residential zones which could have adequately addressed the lack of service in the area of the proposed site.
Sorci testified that by using two additional sites, one in Leonia at the fire hall, and one in Palisades Park, the gap in coverage may be remediated. However, he considered the Christie Street site a better alternative than the other two. He pointed out that the fire hall site would require the construction of a monopole or tower, and he did not know if the site was available. Furthermore the Palisades Park site, although zoned commercial, is primarily residential, with five floors of apartments above stores on the first floor. And neither site was zoned to permit tele-Communications facilities. Sorci also said that no other buildings in the area were sufficiently high to resolve the gap in coverage, and other possible sites may not work as well due to signal interference. See Spinnaker Condo. Corp. v. Zoning Bd. of City of Sea Isle City, 357 N.J.Super. 105, 113, 813 A.2d 1282 (App.Div.2003) (to *98 provide reliable service in coverage area, cell sites must be high enough to permit and receive transmissions, otherwise coverage gaps may result in inadequate service).
Paradas, the radio frequency engineer, visited other possible locations after the variance application was submitted. He testified that they were not sufficient to fill the gap in coverage. He said that if the antennas were located north or south of the site, higher antennas would be needed because the site elevations for the other properties were not as high as the Christie Street property. Furthermore, Sprint could not co-locate its equipment on other carrier's telecommunications facilities, and only by placing the equipment at the, Christie Street site, would 911 service allow rescuers to accurately locate cell phone users in an emergency.
In Ocean County Cellular, supra, we examined whether a telecommunications carrier was required to negate the exis-tence of all other possible sites to establish that the proposed site was particularly suited for the use. 352 N.J.Super. at 528-29, 800 A.2d 891 (discussing language in New York SMSA, supra, 324 N.J.Super. at 161, 734 A.2d 817.) While acknowledging that a carrier's "reasonable and good faith effort to find an alternate, less-intrusive site" was a relevant consideration, we expressed concern that zoning boards not be given "carte blanche power to reject an application based on conjecture that a `possible' alternative site is both suitable and available." Id. at 528-29, 800 A.2d 891. Here, those concerns have been realized. Lacking an evidentiary foundation, the Board concluded that the "telecommunications facilities could be located within commercially zoned areas which would meet the coverage requirements."
Coincidentally, among the proposed alternate sites studied in Ocean County Cellular was a local fire company site, which, as here, the zoning board found to be a reasonable alternative site. Id. at 530, 800 A.2d 891. That site, as the fire hall site in this case, would have required construction of a freestanding monopole or tower. Ibid. We agreed with the carrier's expert that construction of such a tower would be incompatible with the town's zoning scheme. Ibid.
We arrive at the same conclusion in the context of the facts of this case. Neither the Board nor any other party produced evidence to show why a 100-foot freestanding monopole or tower proposed at the fire hall, which is located in a Park Zone and would also require a use variance, would be more compatible with the zoning scheme than discrete 4-foot high antennas attached to the top of a five-story building. See Smart SMR, supra, 152 N.J. at 336, 704 A.2d 1271 (proof of adverse effect on land use plan generally requires expert testimony); Meridian Quality Care, Inc. v. Bd. of Adjustment of the Township of Wall, 355 N.J.Super. 328, 347-48, 810 A.2d 571 (App.Div.2002) (same).
Given the TCA's mandate that local boards should not have the effect of prohibiting the provision of personal wireless services, along with the essentially undisputed evidence that no other existing site in the Borough, in any zone, is of sufficient height and location to fill the gap in service, we conclude that Sprint satisfied the positive criteria. The Board's conclusion that other sites were available in nonresidential zones was conjecture.

VI
We next turn to whether Sprint satisfied the negative criteria. Doing so, we apply the less stringent balancing test under Sica, supra, 127 N.J. at 165-66, 603 *99 A.2d 30, which is normally applicable to traditionally inherently beneficial uses, because telecommunications facilities are federally licensed and serve the general welfare. Smart SMR, supra, 152 N.J. at 332, 704 A.2d 1271; Ocean County Cellular, supra, 352 N.J.Super. at 532, 800 A.2d 891. We weigh the "`positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.'" Smart SMR, supra, 152 N.J. at 332, 704 A.2d 1271 (quoting Sica, supra, 127 N.J. at 166, 603 A.2d 30). When striking a balance,
First, ... [the local land use] board should identify the public interest at stake. Some uses are more compelling than others.... Second, the Board should identify the detrimental effect that will ensue from the grant of the variance.... Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions.... Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.

[Sica, supra, 127 N.J. at 165-66, 603 A.2d 30.]
Generally, the negative criteria pertaining to telecommunications facilities implicate aesthetics. Monopoles and cell towers, which are the subject of most of the telecommunications use variance cases, may be considered by many people to be visually intrusive. Here, however, neither a monopole nor a cell tower has been proposed. To the contrary, Sprint is seeking permission to erect multiple small antennas, none of which will be visible from the street. The antennas will rise no higher than the parapet and other existing structures on the roof. The telecommunications equipment will only be observable from the top floor of the adjacent building. It will be painted to match the background and the equipment platform will be screened. The equipment will be no more intrusive than a television antenna or a satellite dish. Under these circumstances, the aesthetic impact will be minimal.
The equipment is safe. The maximum signal strength will be less than 1.1 percent of FCC safety guidelines. The radio frequency safety expert found no danger to the residential units in the building or the adjacent building. The equipment contains no hazardous materials, creates no noise, requires no municipal services, and is monitored by computers seven days a week, twenty-hours a day. It is also visited approximately once every four weeks by a technician. Yet, in addressing the negative criteria, all of these factors appear to have been disregarded by the Board. The Board said:
The mere showing by the applicant that its proposed telecommunications facility would comply with FCC requirements, that it has a license, and that the location... would provide an adequate level of coverage within the `gap' does not outweigh the negative criteria as to the incompatibility with the Master Plan and Zoning Ordinance, particularly in view of the fact that such telecommunications facilities could be located within commercially zoned areas which would meet the coverage requirements.
The Board pointed to the commercial nature of the use to find that it was inappropriate in a residential zone, but the Board failed to consider or explain what, if any, detrimental effects would ensue from locating this specific commercial use in the zone. Perhaps the reason the Board failed *100 to make those findings is because the evidence, did not disclose any adverse results that would emanate from granting the variance. Unlike a traditional commercial facility that may generate traffic, noise, pollution and require municipal services, the proposed facilities will pose none of those problems. Their impact will be imperceptible. No expert testimony was presented from which the Board could reasonably infer that the telecommunications equipment would lower property values, create a safety hazard, or otherwise have detrimental effects upon the residential zone.
We are cognizant that the facts in this case differ from the facts in the previously cited cases, in that here, the facilities are to be placed in a purely residential zone. However, it is not the classification of the zone itself that is the critical consideration, because with every N.J.S.A. 40:55D-70d application the use is not permitted in the zone. Rather, the question a zoning board must address is what adverse effects granting the variance will have on the zone and the master plan. Here, the record is barren of any such detrimental consequences. See Commons v. West-wood Zoning Bd. of Adjustment, 81 N.J. 597, 609, 410 A.2d 1138 (1980) (mere conclusive statement by board of adjustment, in absence of explaining how facts adversely effect zone plan, insufficient to establish that variance would substantially impair zone plan and ordinance). At the risk of stating the obvious, if a zoning board were permitted to deny a use variance simply because the use was of a type not permitted in the zone, a zoning board could reject a variance simply because a variance was needed.
The proposal would affix equipment on the roof of a five-story preexisting building, on areas of the roof where the equipment would be hidden from the street. The impact of the proposed telecommunications facilities under these facts is essentially innocuous. See generally, William M. Cox, New Jersey Zoning and Land Use Admin., § 7-5.2 (GANN, 2003)("[p]erhaps" what the Court in Smart SMR, supra, intended, when it suggested that antennas appended to existing buildings may be considered inherently beneficial uses, 152 N.J. at 333, 704 A.2d 1271, "was that such attached antennas are so innocuous as to attenuate the balancing of negative and positive criteria particularly in light of the FCC mandate."). For the Board to conclude that the effects of Sprint's proposal upon the zoning scheme would be outweighed, for example, by building a freestanding 100-foot cell tower or monopole at the fire hall, was simply not reasonable.
The only reasonable conclusion open to the Board was that the requested variance could be granted without substantial detriment to the public good. The telecommunications facilities will serve the public interest by filling in the carrier's gap in coverage; and further the TCA's goal of promoting competition among cell phone carriers. They will provide service to mobile users in an area where service does not now existto both Borough residents and those traveling through that area of the municipality. The facilities will allow 911 operators to identify emergency calls made in the coverage area. The equipment will generate no traffic, noise, odors, or pollution, or require municipal services. Nor will it lower property values. The facilities require infrequent maintenance and are considered safe. Although the facilities will be located in a residential zone, any detrimental impact upon the residents will be negligible to nonexistent.
Affirmed. The cross-appeal is dismissed.
NOTES
[1] Sprint has filed a cross-appeal which does not contest the trial court's judgment, but rather the trial judge's reasoning that the proposed use is not "inherently beneficial." However, appeals are taken from judgements, not opinions, and on appeal a respondent may argue any point supported by the record to sustain the trial court's order. Chimes v. Oritani Motor Hotel, Inc., 195 N.J.Super. 435, 443, 480 A.2d 218 (App.Div.1984). The cross-appeal is therefore dismissed.
[2] The Board has not briefed that portion of the Law Division's order granting Sprint height and rear yard variances. The appeal as to those issues is deemed waived. Pressler, Current N.J. Court Rules, comment on R. 2:6-2 (2003).
[3] Subsequent to the Board's decision, the Borough enacted an ordinance designating a specific zone within which telecommunications equipment may be located. That ordinance was subsequently invalidated by the Superior Court.
[4] In dicta, the Court added that, "[a]lthough the issue is not before us, we might reach a different result with a facility that does not require a tower or monopole, such as the one that simply involves appending antennas to an existing structure." Id. at 331, 480 A.2d 218.